PEOPLE v. KOREN.

1. APPEAL AND ERROR—RECORD—INSTRUCTIONS—QUESTIONS REVIEW-
ABLE—CRIMINAL LAW.
   On appeal in prosecution for robbery armed, omission from rec-
   ord of court's instruction to jury was immaterial where de-
   fendant conceded that the instructions were proper in all
   respects.

2. ROBBERY—EVIDENCE—IDENTITY OF ACCUSED.
   In prosecution for robbery armed, in which defendant is alleged
   to have participated, claim that prosecution totally failed
   to establish identity of defendant was without merit, where
   victim of the daylight holdup not only positively identified
   defendant as being present and a participant therein but an-
   other witness positively identified defendant as purchaser of a
   car bearing the same license plates as on that used by the
   robbers.

3. SAME—EVIDENCE—IDENTITY—CORROBORATION—CREDIBILITY.
   In prosecution for robbery armed, admission of testimony as
   to sale of car with license plates bearing same number as
   those on car used by participants in the holdup was not error
   because of remoteness to time of commission of crime charged,
   where sale took place about two months previously, in view
   of fact that such testimony formed an important link in
   chain of circumstances corroborating direct evidence connect-
   ing defendant with the crime, and credit to be accorded such
   evidence was for jury under proper instructions.

4. CRIMINAL LAW—ALIBI—EVIDENCE—MISCARRIAGE OF JUSTICE.
   In prosecution for robbery armed in which defense of alibi was
   interposed and supported by testimony of a physician and
   defendant's wife, where physician's testimony could have
   been believed and defendant still have been found guilty and
   credibility of wife's testimony was for jury, verdict of guilty
   may not be said to have been a miscarriage of justice where
   there was ample support therefor in the record (3 Comp.
   Laws 1929, § 17354).

5. SAME—DIRECTION OF ACQUITTAL—EVIDENCE—CREDIBILITY.
    Verdict of acquittal of a crime should not be directed where there is direct evidence of defendant's guilt, since the credibility of witnesses and weight to' be given the testimony are matters for consideration by the jury.

Appeal from Recorder's Court for the City of Detroit; Van Zile (Donald), J. Submitted July 16, 1942. (Docket No. 80, Calendar No. 41,851.) Decided September 8, 1942. Rehearing denied November 25, 1942.

John Koren was convicted of robbery armed. Affirmed.

*Clifton S. Distin,* for appellant.

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *William E. Dowling,* Prosecuting Attorney, *Frank S. Valenti* and *Henrietta E. Rosenthal,* Assistants Prosecuting Attorney, for the people.

CHANDLER, C. J. Appellant was convicted of the offense of robbery armed and takes this appeal from the judgment of the trial court and from a denial of his motion for a new trial.

He contends:

(1) That the trial court erred in failing to direct a verdict in his favor at the conclusion of the proof because of the insufficiency of the testimony.

(2) That the verdict of the jury was a miscarriage of justice.

(3) That the court erred in admitting testimony relative to a transaction involving the sale of a car some two or three months prior to the robbery, bearing the license plates that were on the automobile that was driven by the men involved in the robbery, because of the remoteness of the transaction.

The offense charged was committed in the city of Detroit on January 16, 1941. One Alexander McAllister was the victim. His version of the affair was as follows:

"I was a victim of a holdup perpetrated on the 16th day of January, 1941, between 2:15 p.m. and 2:30 p.m. Previous to the holdup I started out from the office of the Davy Fuel Company at 14460 Dexter. I had a canvas bag containing about $4,300 for the bank deposit, $3,400 in cash and $900 in checks approximately. I was going to the Detroit Bank at Fenkell and Fairfield, north of the Davy Fuel office. I was walking to my car. When I arrived at my car I noticed a car marking [making?] a "U" turn; just as I arrived at my car and just as I got inside, the car drove up behind me. I was fumbling for my keys to the ignition, the door on the right-hand side was pulled open and a man pointed a gun at me and told me to look straight ahead. I did not get a chance to start my automobile. This took place at the Detroit Terminal Railroad tracks on Dexter in the city of Detroit.

"Someone opened the right-hand door and very shortly after that someone opened the left-hand door. The man who opened the right-hand door pointed a gun at me and told me to look straight ahead. Then someone opened the left-hand door; after I looked at him he told me to look straight ahead. He had a gun in his hand. After he told me to look straight ahead, the man on the right took the canvas bag containing the money and took my car keys. After that they left me and drove away. I turned over the keys. The bag containing the money was taken from the seat beside me. The person who took the bag of money had a revolver pistol in his hand at that time. I see one of the two persons in the center on that side (indicating defendant, John Koren). He was the man on the left-hand side of the car.

"After this occurrence I sat in my car while the car was pulling away. It was headed north, traveling north and I took a record of the license of the car. I remained in my car after they took the money and the keys and saw them go into an automobile. I took the license number off the plates of that car; the number is CH 8013, Michigan 1940. It was a 1937 Chevrolet black sedan.

"After they drove away I left my car, went to the office and immediately called police headquarters. At that time I told the police what had happened, gave them the license number of the same car that drove up behind me.

"I next saw one of the men who held me up and took the bag of money in the police show-up approximately a month after. There were six or seven persons in the show-up, that was the second time I went. I did not pick any persons from the show-up the first time. I was called in later. The second time I picked that man (indicating defendant). I have not seen the other since.

"People's Exhibit 1 is the license plate on the car that drove away after I was held up. They are two 1940 Michigan license plates tied together, license CH 8013 (People's Exhibit 1 offered and received in evidence without objection). I was sure the defendant in this case was one of the two men who held me up and took the money. No question about it in my mind. He was the person who opened the door on the left-hand side."

On January 17, 1941, the day following, police officers found the car described by the victim, bearing license plates No. CH 8013, parked in front of 15918 Princeton, a distance of a little over a mile from the scene of the robbery.

The record discloses that license plates CH 8013 had been issued to one Hugh Gibbons, a young employee of a gasoline and service station at Waverly and Dexter, for a 1932 Hupmobile which he owned

in 1940, and that in November, 1940, he sold this car for $25. Gibbons testified that he could not remember to whom he sold the car, and that he could not positively identify anyone in the court room as the purchaser.

A fellow employee of Gibbons, Archie Amos, positively identified defendant as the purchaser of the Gibbons car. This witness saw defendant on two occasions, once when he came and inquired about the car at which time he had a short conversation with him about who owned the car and the price. Gibbons was not present at the time of this conversation. About two days later, defendant came again and purchased the car. On this occasion, the witness saw defendant but had no discussion with him.

Another fellow employee of Gibbons, one Rue Pardue, testified that he saw the purchaser of the Gibbons car at the gasoline station for about two minutes, but he could not positively identify anyone in the court room as the man who came to the gasoline station to inquire about the car in November; that he was not there when the deal was closed by Gibbons and that the only talk he had with the party who inquired about the car was to advise the person making such inquiry that the car in question was owned by Gibbons.

Defendant was arrested on February 12, 1941, by Sergeant Louis Sanderson of the police department and police officers Brown and Eckstein. These officers testified that, when arrested, defendant gave his name as James Stewart. Later, he said his name was Koren and that Stewart was his brother-in-law who owned the car he was then driving, and that Stewart had been inducted into the army. He said Stewart bought the car that way because he had been having trouble with his wife. At police headquarters, he admitted that he owned the car

and that he had used the name of James Stewart for the purpose of financing the purchase and that there was no such person as James Stewart.

Defendant had the registration card for the automobile which was in the name of James Stewart. His driver's license and selective service card were in the name of John Koren.

In his defense, defendant gave notice of an alibi which placed him in the office of a physician at 16127 Woodward avenue at the hour of the robbery, and proffered in support of such defense the testimony of the physician and his (defendant's) wife. Defendant did not testify.

The physician, Dr. Watters, testified that he had an appointment at his office to treat defendant's child at 2:30 o'clock in the afternoon of January 16th. He said that the child was brought to his office that afternoon by defendant and his wife. He further testified:

"*Q.* At what time of day?

"*A.* The appointment was 2:30 p.m. I assume the appointment would be correct. I have no way of telling the exact minute, whether it was early or late or anything like that.

"*Q.* In other words you do not know whether it would be a few minutes before 2:30 or a few minutes after 2:30.

"*A.* No, I do not.

"*Q.* Was the appointment kept at or about that time by the Korens at your office?

"*A.* Well, to the best of my knowledge, I would say, I would assume that it was.

"*Q.* You are testifying from your records?

"*A.* That is right."

On cross-examination, he stated:

"*Q.* So you may have seen the Korens at a quar-

ter to 3, 10 after 3 or 20 minutes to 3 on that afternoon?

"*A.*   That is correct."

Defendant's wife testified positively that she accompanied her husband to the doctor's office on January 16th; that they left their home to go to said office at about 2 o'clock and arrived there at about 25 minutes after 2; that her husband stayed in the office while the doctor attended the baby; and that she never knew or had never heard of her husband owning a Hupmobile roadster such as he was reputed to have purchased from Hugh Gibbons. She further testified that her husband went to Paw Paw, Michigan, on Saturday, January 18th, and returned home the following Sunday evening.

Ernest Johnson, a detective attached to the holdup squad of the police department, testified relative to the distance and time it took to traverse the route from the scene of the holdup to the doctor's office, and from the scene of the holdup to defendant's home and from there to the doctor's office with two stops of one minute duration, one stop being where the car was located and one at defendant's home. In the first instance, it took 9 minutes, in the second 26 minutes, observing all traffic lights and driving at a speed of about 20 to 25 miles per hour. He also testified the defendant told him and others the morning after the arrest that he (defendant) was in Paw Paw, Michigan, on January 16th, the day of the robbery.

The record does not contain the court's instructions to the jury, but this omission is of no importance in view of the following concession made by appellant in his brief:

"There is no question in the case at hand, as to the propriety of the trial judge's charge to the jury

on the question of alibi, the appellant concedes that the instructions to the jury were proper in all respects. But, it is contended by the appellant that the evidence as a whole produced such a reasonable doubt as to the defendant's guilt, that a verdict of guilty was a miscarriage of justice and that such evidence made it mandatory upon the trial judge either to have found the defendant not guilty or to have granted a new trial."

But counsel contends:

"In this case, the testimony taken as a whole, as shown in the records, is such as to make the verdict of guilty in this case a miscarriage of justice, falling directly under the law as enacted by 3 Comp. Laws of 1929, § 17354 (Stat. Ann. § 28.1096). The testimony of the prosecution totally fails to establish the identity of the appellant as one of the persons involved in the holdup, and further, that the prosecution has also failed to establish beyond a reasonable doubt the fact that appellant was at the scene of the robbery at the time it was perpetrated."

This contention is without merit. The testimony of the victim of the holdup positively identifies defendant as being present at the crime and as a participant therein. The testimony of the witness Amos positively identifies him as the purchaser of a car from Gibbons in November, 1940, that bore license plates with the identical number, CH 8013, which were on the car involved in the robbery.

We are not in accord with appellant's claim that the admission of the testimony of witness Amos was error because of the remoteness of this transaction to the time of the actual commission of the crime charged. This testimony was an important link in a chain of circumstances corroborating direct evidence connecting defendant with the crime. The

credit to be accorded it was for the jury under proper instructions by the court, and there was no error in its admission. No complaint is made that the charge of the court was not proper in all respects.

This brings us to consideration of defendant's alibi. The jury could well have believed the testimony of defendant's witness, Dr. Watters, and still have reached the result they did. The wife's testimony, if true, positively established an alibi, yet the credibility of her testimony was for the jury as triers of the facts. In *People* v. *Petrosky,* 286 Mich. 397, we said:

"The jury was not bound to believe the witnesses who testified in favor of defendant's defense of alibi, as there was testimony to show the contrary * * * and the jury may believe one witness as against many."

We find no merit in the contention that the verdict was a miscarriage of justice or that the trial court should have directed a verdict of acquittal. What we said in *People* v. *Rose,* 268 Mich. 529, is applicable here:

"It is claimed a verdict for defendant should have been directed. There was direct evidence of defendant's guilt. The credibility of the witnesses testifying thereto and the weight of their testimony were for the jury."

The appellant had a fair trial and the verdict reached is amply supported by the record.

The judgment is affirmed.

Boyles, North, Starr, Butzel, Bushnell, and Sharpe, JJ., concurred. Wiest, J., did not sit.